**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DONNA KATZ,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | 2:16cv1627 |
| **UPMC, UPMC HOLDING COMPANY,** | ) | **Electronic Filing** |
| **INC., UPMC HEALTH NETWORK,** | ) | |
| **INC., CHILDREN'S HOSPITAL OF** | ) | |
| **PITTSBURGH OF UPMC**, and | ) | |
| **STACEY A. COTE**, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION**</u>

August 15, 2019

# I.    INTRODUCTION

In her Second Amended Complaint, Plaintiff, Donna Katz ("Katz" or "Plaintiff"), alleges:

(1) discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*

(the "ADA") against Defendants, UPMC, UPMC Holding Company, Inc. ("UPMC Holding"),

UPMC Health Network, Inc. ("UPMC-HN"), and Children's Hospital of Pittsburgh of UPMC

("CHP" or the "Hospital")) (collectively "the UPMC Defendants"); (2) failure to accommodate

in violation of the ADA against the UPMC Defendants; (3) retaliation in violation of the ADA

against the UPMC Defendants; (4) disability discrimination in violation of the Pennsylvania

Human Relations Act, 43 PA. CONS. STAT. §§ 951 *et seq.* (the "PHRA") against the UPMC

Defendants and Stacey A. Cote ("Cote") (collectively the "Defendants"); (5) failure to

accommodate in violation of the PHRA against all Defendants; (6) retaliation in violation of the

PHRA against all Defendants;  (7) disability discrimination in violation of the Pittsburgh

Ordinance against all Defendants; (8) retaliation in violation of the Pittsburgh Ordinance against

all Defendants; (9) failure to accommodate in violation of the Pittsburgh Ordinance against all

Defendants; (10) failure to pay wages in violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (the "FLSA") against the UPMC Defendants; (11) failure to pay wages in violation of the Pennsylvania Wage Payment and Collection Law (the "PWPCL"), 43 PA. CONS. STAT. § 260.9a(b), against the UPMC Defendants; (12) retaliation in violation of the family Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA") against the UPMC Defendants; and (13) interference in violation of the FMLA against the UPMC Defendants.  The Defendants have filed a Motion for Summary Judgment, the Plaintiff has responded and the motion is now before the Court.


II.     STATEMENT OF THE CASE

Katz was employed by CHP as a Registered Nurse from August 3, 1981, until the termination of her employment on February 17, 2015. Defendants, Concise Statement of Material Facts ("Def. CSMF") ¶ 1. At the time of her termination, Katz was a nurse in the Transplant Unit of CHP.  *Id.*; Plaintiff's Counterstatement of Material Facts ("Pl. CSMF") ¶ 1. CHP nurses are subject to a written Corrective Action and Discharge policy that provides for progressive discipline including corrective action and discharge. Def. CSMF ¶ 2; Pl. CSMF ¶ 2. Under the policy, corrective steps consist of counseling and warnings intended to help the staff member improve his or her conduct.  When determining corrective action, previous corrective events and the length of time between events are considered factors. Def. CSMF ¶ 3.

Corrective actions include verbal supervisor counseling, a written warning, suspension/final written warning, and discharge/suspension pending investigation. Def. CSMF ¶ 4.  Before a staff member is discharged, the policy requires a full investigation, due deliberation over the facts of a given situation, and consideration of the nature of a staff member's record. Pl. CSMF ¶ 4.  Discharge may be used even without prior progressive corrective action to address

more serious violations or as a last resort when prior progressive corrective action steps have failed. *Id.*

Since 2009, nurses in the Transplant Unit of CHP were allowed to take up to a 30-minute meal period during each shift. Meal periods were unscheduled, meaning that nurses were responsible for coordinating breaks to ensure coverage for patients in the unit. Def. CSMF ¶ 16. If a nurse receives an uninterrupted meal period as defined by the policy, the lunch is unpaid. Pl. CSMF ¶ 16. UPMC policies require the meal period to be paid if any of the following conditions are not met: (1) the meal period must be scheduled for 30 minutes; (2) the employee must receive twenty (20) consecutive minutes of uninterrupted meal time; and (3) the employee is free to leave the workstation, unit, or area. *Id.* CHP nurses used a timekeeping system where they would swipe their badge at the start of their shift and at the end of their shift and, upon swiping out, would be asked whether they received an uninterrupted meal break or not. If a nurse selected "yes," then the meal break time would be deducted from their pay; if a nurse selected "no", then the meal break time was not deducted from his or her pay. Def. CSMF ¶ 20. Katz admits that she received a copy of this policy while working at CHP. Def. CSMF ¶ 21; Pl. CSMF ¶ 21.

The UPMC Defendants contend that nurses are encouraged to take a lunch break and do not get in trouble if they do so. Def. CSMF ¶ 17. Nursing staff often use "pickle phones", which are hospital-issued phones that interface with the patient call bell/alarm system. To ensure an uninterrupted meal break, CHP encourages nurses not to take their pickle phones with them to lunch. Def. CSMF ¶ 18.

Katz contends, however, that nurses are forced on a regular basis to take their pickle phones with them on their lunch breaks or to work through lunch due to inadequate staffing and workload. Pl. CSMF ¶ 16. Katz further contends that nurses were yelled at when they attempted to

secure time to take a lunch break through assigned relief and/or scheduled lunches. Pl. CSMF ¶ 17.

Further, nurses were chastised for selecting "no" to indicate they did not receive an uninterrupted

meal break on the timekeeping system. *Id.* Therefore, Katz selected "yes" on the timekeeping system

if she ate anything during the day, regardless of whether she received a full 20-minute, uninterrupted

meal break, and she selected "yes" when she did not get an uninterrupted meal break because she

was afraid she would get in trouble with her supervisor, Stacey Cote, if she selected "no" on the

timekeeping system. Pl. CSMF ¶ 22.

CHP nurses are subject to a written Social Networking Policy to ensure that staff

protect patient and proprietary information. Def. CSMF ¶ 9. Under this policy, staff are

specifically prohibited from making any references to patients and/or specific patient information

on social networks such as Facebook, MySpace, LinkedIn, and Twitter, among others. *Id.* Staff

who violate the policy will be subject to discipline, up to and including termination. *Id.* The

policy also applies to everyone who is a CHP staff member, including physicians, residents, and

fellows. Pl. CSMF ¶ 9.

On June 10, 2011, Katz posted the following message on Facebook with respect to an

HGTV contest involving the family of one of her former, deceased patients:

> Please take a few minutes to vote! The Durbin's are truly an awe inspiring family,
> who have experienced such a heart renching [sic] loss of their only child,
> [REDACTED] (transplant recipient) and then the tragic loss of their home. This
> family in spite of all this adversity continues to reach out and support others in
> their community. Please support them in their time of need.

Pl. CSMF ¶ 27. Because of her post on June 10, 2015, Katz was issued a one (1) week

suspension without pay on July 15, 2011, to be served from July 17, 2011, through July 23,

2011, for conduct that violated CHP's Social Networking and Patient Confidentiality. Def.

CSMF ¶ 27. Specifically, Katz was issued this corrective action for posting a patient's first and

last name on Facebook, as well as the patient's diagnosis. Def. CSMF ¶ 28.  Katz admitted that in the post at issue, she included the patient's family's last name, the patient child's last name, and identified the patient child as someone who had died and had received a transplant. Def. CSMF ¶ 29.  Katz received the notice of suspension memorandum, signed the document, and acknowledged that she knew she could file a grievance related to the suspension. Pl. CSMF ¶ 31.  Katz, however, did not file a grievance related to the corrective action. *Id.*

On March 13, 2014, Katz was issued a Final Written Warning for conduct on February 27, 2014, that violated various patient care policies. Def. CSMF ¶ 43.  Specifically, Katz was issued this Final Written Warning for administering a medication to a patient without the proper filter as indicated by the on line formulary, administering Parental Nutrition at the incorrect rate for a prolonged period of time while disregarding the safety measure put into place to prevent such an event, and failing on two occasions during bed side report to verify the medication with the electronic medication administration system ("EMAR") or the medication label. Def. CSMF ¶ 44.

Katz disagreed with the discipline because a thorough investigation was not completed. Pl. CSMF ¶ 43.  Katz further contends that the March 13, 2014, Final Written Warning was issued in retaliation for her filing a grievance over her discipline for the Social Media Policy warning.  Pl. CSMF ¶ 44.  The Final Written Warning specifically stated that any other violation of company policy "shall result in further corrective action, up to and including termination of employment." Def. CSMF ¶ 45.  While Katz understood that she had the right to file a grievance, she chose not to file a grievance with regard to the corrective action. Pl. CSMF ¶ 46.

On August 15, 2014, Katz met with her supervisor, Stacey Cote ("Cote") to discuss her 2014 performance review. Def. CSMF ¶ 47. During such performance review it was noted that:

Katz: (1) received counseling regarding medication safety; (2) was intimidating to newer staff, making them uncomfortable to ask questions: (3) made her peers uncomfortable with her interactions with them; and (4) was reluctant to allow others to cover her for meal breaks, yet she complained about not getting lunch.  Pl. CSMF ¶¶ 47, 48 & 49.

During her review, Katz also discussed her diabetes and medications with Cote. Pl. CSMF ¶ 55. Though disputed by Katz, Cote contends that she encouraged Katz to contact WorkPartners regarding her medical issues. Def. CSMF ¶ 55.  Katz admits, however, that she knew about WorkPartners and that it assisted UPMC employees with work-related issues.  Pl. CSMF ¶ 55.

During this discussion, Katz explained to Cote that she had difficulty managing her blood sugar levels because of her diabetes when she was scheduled for 12-hour shifts. Pl. CSMF ¶ 56. Katz's schedule was changed so she could work two (2) 12-hour shifts and two (2) 8-hour shifts each week. *Id*.  Nurses in the transplant unit were generally scheduled for 12-hour shifts, however, nurses in other units at CHP were scheduled for a combination of 8-hour and 12-hour shifts. *Id*.  Though Katz has been diagnosed as a diabetic since 2007, she did not want to be labeled disabled at that time. Pl. CSMF ¶ 59.

On Friday, February 6, 2015, Katz was scheduled to work a 12-hour shift from 7 AM to 7 PM. Def. CSMF ¶ 58.  During her shift, Sherry Floyd ("Floyd"), an RN Clinical Leader, called Katz to inform her that she was assigning Katz one of two transfers to the unit. Def. CSMF ¶ 60, 64. Floyd contends that Katz angrily responded "Are you fucking kidding me." Def. CSMF ¶ 63. Katz admits only that she said to Floyd "what the hell." Def. CSMF ¶ 63; Pl. CSMF ¶ 63.  Katz told Floyd that she did not feel well and that she needed to eat. Pl. CSMF ¶ 62. Floyd told Katz that if she needed to eat, she should eat "now." Pl. CSMF ¶ 61; Def. CSMF ¶ 61. Katz contends, however, that she could not take a lunch break because no other nurse was

assigned to relieve her and provide nursing coverage for her patients.  Pl. CSMF ¶ 61. After her angry response, Katz ended the call with Floyd[1]. Def. CSMF ¶ 63.

Later that same day, it was reported that Katz raised her voice to a nursing student who was attempting to relay a message to Katz about one of her patients, and she got very argumentative with Dr. Armando Ganoza ("Dr. Ganoza") regarding medical orders he had given regarding one of his patients that was assigned to Katz. Pl. CSMF ¶¶ 67, 69 & 70. Dr. Ganoza wanted the patient's insulin pump shut off, but he failed to give Katz a written order as required by the Hospital's policies. Def. CSMF ¶ 70.  Once Katz received a proper written order from Dr. Ganoza, she shut off the insulin pump and finished all the processes associated with the order. Def. CSMF ¶ 71. Dr. Ganoza told Katz he was going to talk to her supervisor about the confrontation and went to speak with the clinical leader of the unit to address the situation. Pl. CSMF ¶ 72. Dr. Ganoza observed Katz argue with the clinical leader, but, after confirmation from the clinical leader that the patient would be fine despite the situation, Dr. Ganoza finished his patient assessment. *Id.*

On that same day, it is further alleged that Whitney Vavra ("Vavra"), a Professional Staff Nurse, heard Katz say "I can see why people hurt [and] kill co-workers." Pl. CSMF ¶ 74.  Katz admits that she generally "remember[s] being crazy" that day but does not "remember anything [about saying she would hurt/kill coworkers] because [her] sugar was so low," but she had no recollection of her exact words. Pl. CSMF ¶ 75.

---

[1]   On a previous occasion and under similar circumstances, Mary Rentler ("Rentler"), a Senior Professional Staff Nurse, was assisting Katz when Katz received a telephone call from a clinical leader who told Katz she was getting transfer to the unit. Katz hung-up and Rentler heard Katz say "I'm so sick of these stupid clinical leaders." Katz Appendix Exhibit L.

Floyd immediately notified Cote with regard to Katz's alleged disrespectful behavior, and Cote informed her boss, Clinical Director Paula Eicker ("Eicker"). Pl. CSMF ¶¶ 79 & 80. Eicker directed Cote to get statements from everyone involved in the day's events and Eicker would then review them with Human Resources. Pl. CSMF ¶ 80. As part of Cote's investigation, she met with Katz on February 9, 2015. Def. CSMF ¶ 81. Katz contends that at this meeting she asked Cote for regularly scheduled lunch breaks and for assigned relief because of her diabetes. Pl. CSMF ¶ 82.  Katz also admitted, however, that "She never requested an accommodation for her disability, nor did she submit anything to [CHP] in writing requesting an accommodation because from the time she received her diagnosis until her termination she did not consider herself disabled." Katz Deposition p. 164:18-164:24. Further, Katz never submitted a Staff Member Request for Accommodation Form to Human Resources or Work Partners.  Def. CSMF ¶ 86.

On February 10, 2015, Cynthia Ruszcyk of Work Partners emailed Cote notifying her that Katz had requested intermittent FMLA leave on February 9, 2015 with a beginning date of January 12, 2015 through January 11, 2016. Def. CSMF ¶ 87.  Katz contends that she injured her back in a car accident during the first week of January 2015 and began receiving medical treatment in connection with problems lifting due to bulging discs and spinal stenosis. Pl. CSMF ¶ 87.  Because of such injury, Katz needed intermittent FMLA leave to go to physical therapy twice each week. *Id*.

After the investigation, Cote met with Eicker and Janelle Taylor of Human Resources to review the documents related to the investigation, any related company policies, and Katz's previous corrective action history. Pl. CSMF ¶ 89.  Because Katz already had two Final Written Warnings, Cote, Eicker, and Taylor reached a consensus that a recommendation be made to the

Chief Nursing Officer and Human Resources Director to proceed to the next level of corrective action, which was termination. *Id.*

The recommendation for termination was approved on February 17, 2015, and Katz was sent a letter (the "Termination Letter") informing her that her employment was terminated effective immediately. Pl. CSMF ¶ 91. The Termination Letter specifically noted that Katz: (1) had been issued a Final Written Warning on July 15, 2011, for a Facebook posting that contained patient information; (2) had been issued a Final Written Warning on March 17, 2014 for not meeting the expectations in various patient care policies including "Administration of Medications to Children"; and, (3) on February 6, 2015, had created a hostile work environment by the use of comments and actions that others perceived as offensive and such behavior was not isolated to one event or one individual and is consistent with her previous pattern of behavior that she has been counseled for but has not shown improvement. Pl. CSMF ¶¶ 92 & 93; Def. Appendix, Eicker Deposition Exhibit 28.

After receipt of the termination notice, Katz filed a grievance regarding the decision to terminate her employment. Pl. CSMF ¶ 96. By letter dated April 7, 2015, Katz was informed that the Hospital believed the actions taken were appropriate and upheld her termination. Pl. CSMF ¶ 97. The letter also informed Katz that she could appeal the decision in writing within seven (7) calendar days to CHP President, Chris Gessner. *Id.* Katz did not appeal the decision. Pl. CSMF ¶ 98.

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in

dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id.* The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial. *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994).

## IV.   DISCUSSION

### A.   Disability Discrimination

Katz contends that she was a victim of discrimination based upon a disability in violation of the ADA, PHRA and Pittsburgh Ordinance. Though these claims are alleged separately, the Court will consider such claims as one as Pennsylvania courts construe the parallel provisions of the PHRA to be coextensive with their federal counterparts[2]. *Kelly v. Drexel Univ*., 94 F.3d 102, 105 (3d Cir. 1996); *Stultz v. Reese Bros., Inc*., 835 A.2d 754, 759 (Pa. Super. Ct. 2003). The PHRA should be interpreted "as identical to federal anti-discrimination laws except where there is something specifically different in its language" justifying a different construction. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002). Therefore, this Court will apply the same legal guidelines when evaluating the sufficiency of these parallel city, state and federal workplace discrimination and retaliation claims.

The ADA prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability" with respect to hiring, firing, conditions and privileges of employment. 42 U.S.C. § 12112(a). An individual is disabled under the ADA if he or she has: (1) "a physical or mental impairment that substantially limits one or more of the major life activities of such individual;" (2) "a record of such an impairment;" or (3) "[is] regarded as having such an impairment." 42 U.S.C. § 12102(2)(A) - (C).

At the summary judgment stage of litigation, Katz's discrimination claim is analyzed according to the burden shifting approach set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) (hereafter "*McDonnell Douglas*"). *See Stanziale v. Jargowsky*, 200 F.3d

---

[2]   The parties agree that the claim under the Pittsburgh Ordinance shall be analyzed under the same standards as the ADA and PHRA.

101, 105 (3d Cir. 2000) ("The parties' burdens in establishing and defending claims [for discrimination] are determined by the procedure set forth in *McDonnell Douglas Corp. v. Green*."). "[T]he plaintiff must first establish a *prima facie* case. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the discharge. If the defendant does so, the presumption of intentional discrimination disappears, but the plaintiff can still prevail by showing that the employer's proffered reason is merely a pretext for discrimination." *James v. Sutliff Saturn, Inc.*, 468 F. App'x 118, 120 (3d Cir. 2012).

In order to establish a *prima facie* case of discrimination under the Americans With Disabilities Act, a plaintiff must show (1) that she is disabled within the meaning of the Act, (2) that she is otherwise qualified for the job, with or without reasonable accommodations, and (3) that she was subjected to an adverse employment action as a result of discrimination. *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010). "A disabled employee may establish a *prima facie* case under the ADA if she shows that she can perform the essential function of the job with reasonable accommodation and that the employer refused to make such an accommodation." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 610 (3d Cir. 2006) (citing *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 284 (3d Cir. 2001)).

Defendants do not dispute that Katz is disabled within the meaning of the ADA. Instead, they argue that Katz fails to establish the second and third prongs of the *prima facie* case for disability discrimination. The Court, therefore, begins its analysis with whether Katz has presented sufficient evidence to establish that she is otherwise qualified for the job, with or without reasonable accommodations.

Defendants argue that Katz cannot show that she was an "otherwise qualified individual," as her significant corrective action history and misconduct on February 6, 2015 made her unfit for her position, and her attempt to simply excuse this misconduct and have a second chance to

better control her treatable condition is unreasonable as a matter of law. The Court finds such argument suitable for Katz's failure to accommodate claim, but not in this discrimination claim.

In order to determine whether a disabled individual is otherwise qualified, the Court considers "(1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006). At the time Katz was terminated, she was qualified to work as pediatric nurse as she employed as such by CHP for more than thirty (30) years. The fact that she had a corrective action history and misconduct issues, does not minimize her qualifications to work as a pediatric transplant nurse.

Katz fails, however, to show that her termination was, in fact, based upon discrimination. In fact, Katz makes no argument that her termination was the result of disability discrimination. Specifically, Katz states in her brief in opposition: "Unquestionably, Ms. Katz suffered an adverse employment action because she was terminated by Defendants after more than 30 years of employment as a pediatric nurse at CHP on February 17, 2015." Katz Brief p. 4. No one disagrees that Katz suffered an adverse employment action, but Katz must direct this Court to some evidence that the adverse employment action was the result of disability discrimination. Though in other sections of her brief Katz mentions a purported "hypoglycemic episode" that she suffered February 6, 2015, there is no evidence that such episode occurred. Nor is there any evidence of a causal relationship between her misconduct and the alleged episode. Because she fails to show that her termination was based upon discrimination, Katz is unable to establish a *prima facie* case of discrimination under the ADA.

Accordingly, summary judgment will be entered in favor of the UPMC Defendants at Count I and in favor of all Defendants at Counts IV and VII.

B.    Failure to Accommodate

Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). "In other words, an employer can unlawfully 'discriminate' within the meaning of the ADA in two different ways . . . : (1) if the employer takes adverse action against a qualified individual with a disability and that decision was motivated by the individual's actual disability or the employer's belief that the individual had a disability (i.e. disparate treatment); or (2) if the employer fails to make reasonable accommodations for that individual." *Fuoco v. Lehigh Univ.*, 981 F. Supp. 2d 352, 361 (E.D. Pa. 2013).

In order to establish an ADA failure-to-accommodate claim, Katz must show that: (1) she was disabled and CHP was aware of her disability; (2) she requested an accommodation or assistance; (3) CHP did not make a good faith effort to assist her; and (4) she could have been reasonably accommodated. *See Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (Citations omitted).  Once a qualified individual with a disability requests reasonable accommodation, that notice would trigger the employer's duty to engage in an "interactive process" with the individual to determine what accommodations would overcome his or her limitations. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d at 311-313, 315. Because the statute explicitly states that the employer may be held liable for failure to make accommodations for a known disability, it is clear that the employer "must know of both the disability and the employee's desire for accommodations for that disability." *Id.* at 313 (noting that "[e]mployers cannot assume employees are disabled and need accommodations").  In the Third Circuit, "[w]hat matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough

information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Id.* at 311. Employees carry the initial burden of providing notice and asking for help. *Isley v. Aker Phila. Shipyard, Inc.*, 275 F. Supp. 3d 620, 630 (E.D. Pa. 2017) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d at 313).

Katz admits that on February 6, 2015, the date of the incidents leading to her termination, she did not consider herself to be, and did not want to be labeled as, disabled. Def. CSMF ¶ 59; Pl. CSMF ¶ 59. During Cote's investigation into Katz's February 6, 2015, behavior, Katz maintains that she did in fact request accommodations in the form of regularly scheduled lunch breaks and assigned relief[3]. Prior to her February 9, 2015, meeting with Cote, however, Katz never expressed a desire for accommodation.

Even assuming that Katz did in fact request accommodations for disability on February 9, 2015, the UPMC Defendants are not required to reasonably accommodate her disability by overlooking her past misconduct—irrespective of whether the misconduct resulted from her disability. *See Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1316 (10th Cir. 2017). The Equal Employment Opportunity Commission's ("EEOC") Enforcement Guidance makes clear that the requirement to provide reasonable accommodations under the ADAAA is "always prospective," and that "an employer is not required to excuse past misconduct even if it is the result of the individual's disability." *Id.* (citing U.S. EQUAL OPPORTUNITY EMPLOYMENT COMM'N, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT AT NO. 36); *see also id.* at NO. 35 ("An

---

[3]     In her deposition, however, Katz indicated that she never requested an accommodation for her disability, nor did she submit anything to [CHP] in writing requesting an accommodation because from the time she received her diagnosis until her termination she did not consider herself disabled.

employer never has to excuse a violation of a uniformly applied conduct rule that is job-related and consistent with business necessity."); *Davila v. Qwest Corp., Inc.*, 113 F. App'x 849, 854 (10th Cir. 2004) ("excusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA.").

Several circuits have reached the same conclusion. *See, e.g., McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("A requested accommodation that simply excuses past misconduct is unreasonable as a matter of law."); *Hill v. Kan. City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999) ("[Plaintiff] did not request a disability accommodation, she asked for a second chance to better control her treatable medical condition. That is not a cause of action under the ADA."); *Burch v. Coca Cola Co.*, 119 F.3d 305, 319 n.14 (5th Cir. 1997) ("[A] 'second chance' or a plea for grace is not an accommodation as contemplated by the ADA."); *Siefken v. Vill. of Arlington Heights*, 65 F.3d 664, 666-67 (7th Cir. 1995) ("[Plaintiff] is not asking for an accommodation; he is not asking [his employer] to change anything. He is asking for another chance . . . . But the ADA does not require this.")[4].

The Court certainly recognizes that an employee may request a reasonable accommodation after an employer indicates it has performance concerns, as an employee may not know or be willing to acknowledge that there is a problem requiring accommodation. The

---

[4]    Citing U.S. Equal Opportunity Employment Comm'n, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act at No. 36 and *Dewitt v. Southwestern Bell Tel. Co., supra.*, The United States District Court for Easter District of Pennsylvania granted summary judgment on an employee's failure to accommodate claim finding that an employer was not required to excuse an employee's unauthorized breaks simply because she now asserts that such conduct was necessitated by her disability and could have been a reasonable accommodation. *See Arana v. Temple Univ. Health Sys.*, 2018 U.S. Dist. LEXIS 74921 at *16-17 (E.D. Pa, May 3, 2018).

employer, however, is not required to terminate an ongoing disciplinary process based upon a *post hoc* request for reasonable accommodation. Here, Katz had been issued a Final Written Warning on March 13, 2014, for violations of various patient care policies. The Final Written Warning specifically stated that any other violation of company policy "shall result in further corrective action, up to and including termination of employment." The UPMC Defendants had no obligation to excuse her February 6, 2015, misconduct or stop the investigation simply because Katz allegedly requested a reasonable accommodation. Moreover, the EEOC has further specifically advised that, where the appropriate disciplinary action is termination, no further discussion is required:

> 10.     What should an employer do if an employee mentions a disability and/or the need for an accommodation for the first time in response to counseling or discipline for unacceptable conduct?
>
> If an employee states that her disability is the cause of the conduct problem or requests accommodation, the employer may still discipline the employee for the misconduct. If the appropriate disciplinary action is termination, the ADA would not require further discussion about the employee's disability or request for reasonable accommodation. *The Americans with Disabilities Act: Applying Performance and Conduct standards to Employees with Disabilities*, U.S. Equal Employment Opportunity Commission (Dec. 20, 2017).

Because Katz was terminated on February 17, 2015, eight (8) days after her alleged request for reasonable accommodation, the Defendants had no duty to engage in the "interactive process" with her to determine what accommodations would overcome her limitations. Katz, therefore, is unable to establish her failure to accommodate claims under the ADA, the PHRA and the Pittsburgh Ordinance.

Accordingly, summary judgment will be entered in favor of the UPMC Defendants at Count II and in favor of all Defendants at Counts V and IX.

C.    Retaliation

Claims of retaliation under the ADA, FMLA, and PHRA are analyzed under the

*McDonnell Douglas* burden-shifting framework. *See Williams v. Phila. Hous. Auth. Police*

*Dep't.*, 380 F.3d 751, 759 (3d Cir. 2004) (applying *McDonnell Douglas* framework to ADA

retaliation claim); *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 256 (3d Cir. 2014)

(applying framework to FMLA retaliation claims); *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181,

193 (3d Cir. 2015) (applying framework to PHRA retaliation claims). Under this framework, the

analysis proceeds in three stages: (1) the plaintiff must establish a *prima facie* case of retaliation;

(2) if the plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate,

nondiscriminatory reason for its adverse action against the plaintiff; (3) if the defendant does so,

the burden then returns to the plaintiff to prove by a preponderance of the evidence that the

defendant's proffered reason is a pretext for retaliation. *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802-803 (1973); *Williams v. Phila. Hous. Auth. Police Dep't.*, 380 F.3d at 759 n.3.

While the burden of production may shift, the burden of persuasion remains at all times with the

plaintiff. *Id.*

Assuming that Katz has established a *prima facie* case of retaliation in this instance, the

burden shifts to Defendants to offer a legitimate, non-discriminatory reason for taking the

adverse employment action.  *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644

n.5 (3d Cir. 1998); *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997).  This

burden is "relatively light" and is satisfied if the employer provides evidence, "which, taken as

true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable

employment decision."  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting

*Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)); *see also Lichtenstein v. Univ. of Pittsburgh*

*Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (describing this step as a "minimal burden").

Here, the Defendants have articulated a legitimate, non-discriminatory, and non-retaliatory reason for Katz's termination. Katz, having been issued a Final Written Warning for violations of various patient care policies, violated multiple written company policies and created a hostile work environment on February 6, 2015.  Katz swore at her Supervisor, argued with Dr. Ganoza regarding medical orders he had given regarding one of his patients, was rude to a nursing student, seemingly threatened her co-workers, and failed to control her diabetes to the extent she was more than a distraction in the unit. Katz's egregious misconduct on February 6, 2015, coupled with her significant corrective action history resulted in her termination.

The burden returns to Katz to show that the Hospital's proffered reasons for the adverse employment actions are a pretext for retaliation [and/or discrimination][5].  To establish pretext, Katz must "either (i) discredit[] the proffered reasons, either circumstantially or directly, or (ii) adduc[e] evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  The evidence rebutting Defendants' proffered reasons must allow a factfinder to conclude that such reasons were either a "post hoc fabrication" or otherwise did not actually prompt the employment action. *Id.*  Katz must introduce evidence of pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' . . . and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" *Id.* at 765. The employee "must show, not merely that the employer's proffered reason was wrong, but that it was so

---

[5]   Notwithstanding this Court's finding that Katz failed to establish a *prima facie* case of discrimination under the the the ADA, PHRA and Pittsburgh Ordinance, such claims also fail under the *McDonnell Douglas* burden-shifting framework.

plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc). Katz, however has not directed this Court to any evidence that would cause it to disbelieve the Defendants' reasons for the adverse employment action.

In support of her contention that the Defendants' purported reasons for her termination were mere pretext for a retaliatory or discriminatory motive, Katz argues that: (1) others swear in the workplace and have not been terminated; (2) arguing with a co-worker, such as Dr. Ganoza, is common in any workplace; and (3) the Defendants' never perceived Katz' alleged threat to co-workers as a serious matter. With regard to her contention that other co-workers swore in the workplace but were not terminated, Katz fails to show that such workers were similarly situated. There is no evidence that these alleged co-workers were working under a Final Written Warning, or that they swore at, and hung up on, their supervisor. Moreover, Katz fails to consider the cumulative effect of her conduct which occurred during a portion of one shift in the pediatric transplant unit. In addition, past performance reviews indicated that Katz was intimidating to newer staff, and that she made her peers uncomfortable with her interactions with them. Her conduct on February 6, 2015, therefore, was not the first time she created a hostile work environment.

Katz further argues that the fact she was experiencing a "severe hypoglycemic episode" on February 6, 2015, should have been a mitigating circumstance and should have been considered in the investigation. Katz, however, was not a newly diagnosed diabetic and should have been able to control her diabetes during her shift. She was urged to go to lunch, and she refused. Moreover, she failed to bring any snacks to work despite knowing she was scheduled for a twelve (12) hour shift. The record evidence further indicates that Katz often found time to take

smoking breaks. Katz, therefore, has failed to show that the Defendants' stated reasons for her termination were a pretext for retaliatory or discriminatory conduct.

Accordingly, summary judgment will be entered in favor of the UPMC Defendants at Counts III and XII and in favor of all Defendants at Counts VI and VIII.

D.     Interference under the FMLA

At Count XIII of her Second Amended Complaint, Katz alleges that the UPMC Defendants interfered with her rights under the FMLA. To succeed on an interference claim, a plaintiff must show:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014) (citing *Johnson v. Cmty. Coll. Of Allegheny Cnty.*, 566 F. Supp.2d 405, 446 (W.D. Pa. 2008)). That is, "the employee needs to show that he was entitled to FMLA benefits and that the employer denied them." *Foye v. SEPTA*, 2017 WL 1150259 (E.D. Pa. March 28, 2017).

A claim of interference differs from a retaliation claim as it is not about discrimination. *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 155 (3d Cir. 2017). Therefore, an employer cannot defeat the claim by showing that there was a legitimate business reason for its decision. *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006). Interference claims deal only with "'whether the employer provided the employee with the entitlements guaranteed by the FMLA.'" *Id.* (quoting *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005)). Therefore, this Court's ruling at Section C above is not relevant to the FMLA interference claim.

The UPMC Defendants do not contest the first two elements: (1) that Katz was an eligible employee under the FMLA and (2) that they were employers subject to the FMLA's

requirements. The UPMC Defendants argue, however, that Katz cannot show that she was entitled to FMLA leave or that she was denied benefits to which she was entitled. The Court agrees.

An employee is entitled to FMLA leave if she suffers from "a serious health condition" which "makes the employee unable to perform the functions of the position." 29 U.S.C.A. § 2612(a)(1)(D). A serious health condition is defined as "an illness, injury, impairment, or physical or mental condition" which involves either "inpatient care in a hospital, hospice, or residential medical care facility" or "continuing treatment by a health care provider." 29 U.S.C.A. § 2611(11). There is no indication that Katz was incapacitated or had an overnight stay in any type of medical facility. Therefore, in order for her to have been eligible for leave she must have sufficient evidence to support a finding that she was receiving continuing treatment.

To show continuing treatment a plaintiff must present evidence that shows she suffered from a chronic condition. A chronic condition is defined as one that

> (1) [r]equires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider; (2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and (3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

29 C.F.R. § 825.115(c).

Katz contends that she was entitled to intermittent FMLA leave due to injuries sustained in a car accident during the first week of January 2015. According to Eric J. Ardinger, D.O. ("Dr. Ardinger") Katz suffered a "disc bulge which aggravated her lumber spine degenerative disc disease" which required periodic treatments with a physical therapist. *See* Katz Exhibit M. According to Eric J. Ardinger, D.O. ("Dr. Ardinger") Katz suffered a "disc bulge which aggravated her lumber spine degenerative disc disease" which required periodic treatments with a physical therapist. *See* Katz Exhibit M. Katz first saw Dr. Ardinger on January 7, 2015, and

did not see him again until February 9, 2015. *See* Katz Exhibit N. Moreover, she had no physical therapy treatment until February 13, 2015 after she requested intermittent FMLA leave on February 9, 2015. *Id.*

The Court finds that Katz has established that she was entitled to FMLA and that she gave notice of her intention to take such leave. *See* Katz Exhibit M. The Court finds, however, that Katz was not denied her benefits under the FMLA. The undisputed record shows that Work Partners received a request for intermittent FMLA leave and conditionally approved her to take such leave pending approval upon receipt of the required health care provider information to substantiate her request. Dr. Ardinger completed the required health care provider information on February 17, 2015, the same day Katz was terminated. *See* Katz Exhibit M; Def. CMSF ¶¶ 87, 88, 90-92. Katz FMLA benefits were not denied as she was terminated before WorkPartners was able to substantiate her request for benefits. Katz, therefore, has failed to establish her claim for interference with FMLA benefits

Accordingly, summary judgment will be entered in favor of the UPMC Defendants at Count XIII.

E.       Wage Claim Under the FSLA and PWPCL

The Court of Appeals for the Third Circuit has recognized that "[t]he FLSA and [P]WPCL are parallel federal and state laws." *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 308 (3d Cir. 2003). Among the bedrock principles of the FLSA is the requirement that employers pay employees for all hours worked. 29 C.F.R. § 778.223 ("Under the Act an employee must be compensated for all hours worked."); *see also Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 913 (9th Cir. 2004) ("One of the principal purposes of the FLSA is to ensure that employees are provided appropriate compensation for all hours worked.") In order to prevail on an FLSA claim for unpaid hours, an employee must prove that they "were suffered or

permitted to work without compensation." *Stanislaw v. Erie Indem. Co.*, 2012 U.S. Dist. LEXIS

19032 at *10 (W. D. Pa. February 15, 2012) (citing *Allen v. Board of Public Education for Bibb*

*County*, 495 F.3d 1306, 1314 (11th Cir. 2007)).

"The FLSA itself does not define what are compensable work hours. Instead, the Wage

and the Hour Division of the Department of Labor issued a number of regulations providing

employers and employees alike guidance on how it would implement and enforce the law. One

such regulation provides that employers need not compensate employees for bona fide meal

periods because those are not considered to be compensable worktime. The regulation defines a

bona fide meal period as rest periods during which '[t]he employee must be completely relieved

from duty for the purpose of eating regular meals,' but '[t]he employee is not relieved if he is

required to perform any duties, whether active or inactive, while eating." *Jones v. Does*, 857

F.3d 508, 515 (3d Cir. 2017) (internal citations omitted). The FLSA does, however, require

employees to be compensated for meal periods if they are "primarily engaged in work-related

duties during" those times. *Id.*

Katz contends that the Defendants forced her and other employees to work through their

meal breaks and intimidated them into selecting "yes" to indicate that they received a lunch even

when they did not. Katz further contends that the Defendants were aware that she was

performing compensable activities for which she was not being compensated. The Defendants,

however, argue that they cannot be held liable for Katz's alleged wage violations because

they maintained multiple channels for Katz to ensure truthful and accurate time records,

yet she failed to use any of these methods.

In *Stanislaw v. Erie Indem. Co.,* this Court stated:

Where an employer has no knowledge that an employee is engaging in
[uncompensated] work and that employee fails to notify the employer or
deliberately prevents the employer from acquiring knowledge of the

24

[uncompensated] work, the employer's failure to pay for the overtime hours is not a violation of the FLSA.  In other words, "[t]here is no violation of the FLSA where the employee performs uncompensated work but deliberately prevents his or her employer from learning of it." However, "[a]n employer who is armed with this knowledge cannot stand idly by and allow an employee to perform [uncompensated] work without proper compensation, even if the employee does not make a claim for the [] compensation." Constructive knowledge can be imputed to the employer when "it has reason to believe that its employee is working beyond his shift." Moreover, "when an employer's actions squelch truthful reports of [uncompensated time] worked, or where the employer encourages artificially low reporting, it cannot disclaim knowledge."

*Stanislaw v. Erie Indem. Co.*, 2012 U.S. Dist. LEXIS 19032 at *10-11 (Internal citations omitted).

In this instance, there is a question of fact whether the Defendants discouraged accurate reporting on the timekeeping system with regard to meal breaks. Accordingly, summary judgment on Katz's FLSA and PWPCL claims will be denied.


**V.     CONCLUSION**

Based on the foregoing, Defendants' motion for summary judgment shall be granted in part and denied in part.  An appropriate Order follows.


Cercone, J.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONNA KATZ,                              )
                                         )
        Plaintiff,                )
                                         )
    v.                               )
                                         )      2:16cv1627
**UPMC, UPMC HOLDING COMPANY**,  )      **Electronic Filing**
**INC., UPMC HEALTH NETWORK,**        )
**INC., CHILDREN'S HOSPITAL OF**      )
**PITTSBURGH OF UPMC**, and           )
**STACEY A. COTE**,                   )
                                         )
        Defendants.               )

### ORDER OF COURT

AND NOW, this 15th day of August, 2019, upon consideration of the Motion for

Summary Judgment filed on behalf of Defendants (**Document No. 75**), Plaintiff's response

thereto, the briefs and appendices filed in support thereof, and pursuant to the Memorandum

Opinion filed herewith,

IT IS HEREBY ORDERED that the Motion for Summary Judgment is granted in part

and denied in part. Summary Judgment on Katz's FLSA and PWPCL claims (Counts X and XI)

against the UPMC Defendants is **DENIED**.  In all other aspects the motion for Summary

Judgment is **GRANTED**.  Counts I, II, III, IV, V, VI, VII, VIII, IX, XII and XIII are dismissed.

Defendant Stacey Cote is dismissed from this action.


                s/ DAVID STEWART CERCONE
                David Stewart Cercone
                United States District Judge

cc:    Steven E. Winslow, Esquire
       Patrick K. Lemon, Esquire
       James F. Glunt, Esquire
       *(Via CM/ECF Electronic Mail)*

26